In The

# United States Court Of Appeals
## For The Fourth Circuit

## LEANNE M. STYNCHULA;
## ADAM NETKO; TIGIST BIRKE,

*Plaintiffs – Appellants,*

v.

## INOVA HEALTH CARE SERVICES,

*Defendant – Appellee,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

_____

BRIEF OF APPELLANTS
LEANNE STYNCHULA, ADAM NETKO,
AND TIGIST BIRKE

_____

Timothy P. Bosson (VSB: 72746)
Isaiah R. Kalinowski (VSB: 71125)
Robert G. Rose, Esq. (VSB: 81240)
Arie M. Jones, Esq. (VSB: 98248)
BOSSON LEGAL GROUP PC
8300 Arlington Boulevard, Suite B2
Fairfax, VA 22031
(571) 775-2529
tbosson@bossonlaw.com
ikalinowski@bossonlaw.com

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  24-2227          Caption:  Leanne M. Stynchula v. Inova Health Care Services (Consolidated)

Pursuant to FRAP 26.1 and Local Rule 26.1,

Leanne M. Stynchula, Adam Netko & Tigist Birke
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Timothy Bosson, Esq.                    Date:        12/30/2024

Counsel for: Stynchula, Netko & Birke, Appellant

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES...................................................................................... iii

STATEMENT OF JURISDICTION ........................................................................1

STATEMENT OF ISSUES .....................................................................................1

STATEMENT OF THE CASE.................................................................................2

    A.    Facts Applicable to All Appellant Employees.......................................2

    B.    Facts specific to Adam Netko.................................................................4

    C.    Facts Specific to Leanne Stynchula .......................................................6

    D.    Facts Specific to Tigist Birke .................................................................9

SUMMARY OF THE ARGUMENT .....................................................................11

ARGUMENT ........................................................................................................13

    I.    Standard of Review. ...........................................................................13

    II.    The district court failed to apply mandatory precedent regarding religiosity of sincerely-held beliefs. ....................................................14

        A.    *Barnett's* implications for Employees' disparate treatment and VHRA claims ....................................................................16

        B.    Implications Of Reversal of District Court's Grant of Motion to Dismiss Upon the Later Grant Of Summary Judgment ......................................................................................18

    III.    Netko acted in accordance with his sincerely held religious beliefs. ................................................................................................19

      A.     Netko maintained evolving religious beliefs galvanized by the loss of his unborn child and conversion experience. ..........20

      B.     Netko refrained from taking any vaccine or medicine that he knew was developed using fetal cells. .................22

IV.   Birke and Stynchula maintained religious beliefs that conflicted with the use of the Novavax vaccine...................27

      A.     The district court's analysis of Novavax as an accommodation is premised on its earlier decision already overruled by this court. ...........28

      B.     Birke and Stynchula believed that the Novavax vaccine violated their religious beliefs...................31

      C.     Novavax's COVID-19 vaccine was in fact tested using fetal cell lines. ...................33

      D.     The district court's analysis was based on inadmissible hearsay, and the residual exception to the hearsay rule does not apply. ...................35

V.    Stynchula's beliefs were both religious in nature and sincere ............38

      A.     Stynchula's beliefs were religious in nature ..............38

      B.     Stynchula's religious beliefs were sincere ...............44

VI.   The district court erred in excluding Dr. Sherley's expert testimony ...................47

      A.     Dr. Sherley's opinion is reliable...................49

      B.     Dr. Sherley's opinion is relevant...............53

CONCLUSION ...................55

REQUEST FOR ORAL ARGUMENT ...................56

CERTIFICATE OF COMPLIANCE ...................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Africa v. Commonwealth of Pennsylvania,*
    662 F. 2d 1025 (3d Cir. 1981) ...............................................14, 38, 39, 40, 42

*Barnett v. Inova Health Care Servs.,*
    125 F.4th 465 (4th Cir. Jan. 7, 2025).......................................................passim

*Bresler v. Wilmington Tr. Co.,*
    855 F.3d 178 (4th Cir. 2017) .........................................................................49

*Chen v. Holder,*
    583 F. App'x 164 (4th Cir. 2014)..................................................................24

*Cisson v. C.R. Bard, Inc. (In re C.R. Bard, Inc.),*
    810 F.3d 913 (4th Cir. 2016) ...................................................................36, 37

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993).......................................................................................49

*Dettmer v. Landon,*
    799 F.2d 929 (4th Cir. 1986) ........................................................................39

*Doswell v. Smith,*
    No. 94-6780, 1998 U.S. App. LEXIS 4644
    (4th Cir. Mar. 13, 1998)................................................................................40

*EEOC v. Ilona of Hungary, Inc.,*
    108 F.3d 1569 (7th Cir.1997) .......................................................................21

*EEOC v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De P.R.,*
    279 F.3d 49 (1st Cir. 2002)...........................................................................19

*Feminist Majority Found. v. Hurley,*
    911 F.3d 674 (4th Cir. 2018) ........................................................................17

*Gardner-Alfred v. FRB of N.Y.*,
 No. 22-cv-1585 (LJL), 2023 U.S. Dist. LEXIS 171012
 (S.D.N.Y. Sep. 25, 2023)................................................................25

*GE v. Joiner*,
 522 U.S. 136, 118 S. Ct. 512 (1997) ...........................................50

*Grayson v. Schuler*,
 666 F.3d 450 (7th Cir. 2012) .......................................................26

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
 896 F.2d 1542 (9th Cir. 1989) .....................................................36

*Hernandez v. Commissioner*,
 490 U.S. 680 (1989)......................................................................42

*J.S. v. Isle of Wight Cty. Sch. Bd.*,
 402 F.3d 468 (4th Cir. 2005) ..............................................13, 14

*Kay v. Bemis*,
 500 F.3d 1214 (10th Cir. 2007) ...................................................19

*Lucky v. Landmark Med. of Mich., P.C.*,
 103 F.4th 1241 (6th Cir. 2024)..................................41, 42, 43

*Lyons v. City of Alexandria*,
 35 F.4th 285 (4th Cir. 2022) ........................................................36

*Md. Highways Contractors Ass'n v. Maryland*,
 933 F.2d 1246 (4th Cir. 1991) .....................................................36

*Mickle v. Moore (In re Long Term Admin. Segregation of Inmates Designated As Five Percenters)*,
 174 F.3d 464 (4th Cir. 1999) .......................................................39

*Moussazadeh v. Tex. Dep't of Criminal Justice*,
 703 F.3d 781 (5th Cir. 2012) .......................................................26

*Nease v. Ford Motor Co.*,
 848 F.3d 219 (4th Cir. 2017) ...............................................49, 50

*Passarella v. Aspirus, Inc.*,
　　108 F.4th 1005 (7th Cir. 2024) .................................................28, 40, 41, 42, 43

*Patrick v. LeFevre*,
　　745 F.2d 153 (2d Cir. 1984) ...........................................................16, 39, 40

*Ringhofer v. Mayo Clinic, Ambulance*,
　　102 F.4th 894 (8th Cir. 2024) ........................................................28, 42, 43

*Semenova v. Md. Transit Admin.*,
　　845 F.3d 564 (4th Cir. 2017) ......................................................................13

*Singh v. Holder*,
　　720 F.3d 635 (7th Cir. 2013) ......................................................................24

*Sturgill v. Am. Red Cross*,
　　114 F.4th 803 (6th Cir. 2024) .....................................................................28

*Thacker v. Dixon*,
　　784 F. Supp. 286 (E.D.N.C. 1991) .............................................................23

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*,
　　450 U.S. 707 (1981).....................................................25, 39, 44, 45, 46

*Thornton v. Ipsen Biopharmaceuticals, Inc.*,
　　No. 23-1951, 2025 WL 2115172025, U.S. App. LEXIS 1049
　　(1st Cir. Jan. 16, 2025) ......................................................................28, 43

*In re Under Armour Sec. Litig.*,
　　Civil Action No. RDB-17-0388, 2024 U.S. Dist. LEXIS 68718
　　(D. Md. Apr. 16, 2024)................................................................................50

*United States v. Clarke*,
　　2 F.3d 81 (4th Cir. 1993) ............................................................................36

*United States v. Dunford*,
　　148 F.3d 385 (4th Cir. 1998) ......................................................................37

*United States v. Gallardo*,
　　970 F.3d 1042 (8th Cir. 2020) ....................................................................37

*United States v. Heyward*,
    729 F.2d 297 (4th Cir. 1984) ........................................................36

*United States v. Peneaux*,
    432 F.3d 882 (8th Cir. 2005) ........................................................37

*Varkonyi v. United Launch All., LLC*,
    No. 2:23-cv-00359-SB-MRW, 2024 U.S. Dist. LEXIS 31679
    (C.D. Cal. Feb. 21, 2024) ........................................................24, 25

**Statutes**

28 U.S.C. § 1291 ........................................................1

28 U.S.C. § 1331 ........................................................1

Va. Code Ann. § 2.2-3905(B)(1)(a)........................................................17

**Rules**

Fed. R. Evid. 807(a) ........................................................36

Fed. R. Evid. 807(b)........................................................37

Fed. R. Civ. P. 12(b)(6)........................................................13

**Other Authorities**

Strauss, Valerie, Washington Post, "No, covid-19 vaccines aren't made
from aborted fetuses – and more lessons about fake news" (Dec. 8, 2020),
available at https://www.washingtonpost.com/education/2020/12/08/no-
coronavirus-vaccines-arent-made-aborted-fetuses-or-created-control-
population-more-lessons-about-fake-news/
    (last visited February 10, 2025)........................................................33

Sandhya Bangaru, *et al.*, *Structural analysis of full length SARS-CoV-
2 spike protein from an advanced vaccine candidate*,
    370:6520 SCIENCE 1089-1094 (Oct. 20, 2020)........................................................49

Sandhya Bangaru *et al.*, *Supplementary Materials for Structural
analysis of full length SARS-CoV-2 spike protein from an advanced
vaccine candidate*,
    SCIENCE (Oct. 20, 2020) ........................................................49

## STATEMENT OF JURISDICTION

The Eastern District of Virginia Federal Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as these cases involve a federal question. This Court has jurisdiction over these appeals pursuant to 28 U.S.C. § 1291. After oral argument on Inova's Motions to Dismiss and a bench ruling on 7 March 2024, the district court entered Orders on 26 March 2024, dismissing with prejudice Employees' accommodation claims for all religious beliefs other than one, and dismissing two other counts entirely. JA241-243. After hearing oral argument on Inova's Motion for Summary Judgment, the district court issued a memorandum opinion on 19 November 2024, dismissing the Employees' remaining claims with prejudice. JA1369-1406. The district court entered final Orders of dismissal, and judgment entered. JA1407-1413. Appellants timely filed their Notices of Appeal. JA1414-1418.

## STATEMENT OF ISSUES

1.      Whether the district court erred in granting a motion to dismiss, ruling on religiosity that beliefs rooted in biblical and other religious authorities, and supplemented by prayerful consideration, were not religious beliefs, and also dismissing Appellants' disparate treatment and state law claims;

2.     Whether the district court erred by granting summary judgment on the basis of sincerity against two of the Employees, when the evidence, completely ignored by the district court, presented a genuine issue of material fact;

3.     Whether the district court erred by granting summary judgment against two of the Employees on the premise that their religious objections had been mooted, when that premise rested primarily on the faulty grant of the motions to dismiss; and

4.     Whether the district court erred in excluding the testimony of Employees' expert witness, when the expert was well qualified, addressed relevant issues of material fact, and applied reliable methodology.

## STATEMENT OF THE CASE

This appeal is about three employees being forced to choose between their religious beliefs and their employment.  They chose their beliefs.

### A. Facts Applicable to All Appellant Employees.

In July 2021, Appellee Inova Health Care Services ("Inova") developed its first Covid-19 vaccination policy and thereafter approved 94% of all employee medical or religious exemption requests.  JA898 (710 exemption requests and denied just forty-six).  Under that policy, Appellants Adam Netko, Tigist Birke, and Leanne Stynchula (collectively "Employees") received religious exemptions. JA1373-1375.

At the end of 2021, as the pandemic began to subside, Inova changed their Covid-19 policy and required all employees that desired exemptions to reapply. JA1370-71. While Inova claims the change was in response to a mandate from the Center for Medicare and Medicaid Services ("CMS Mandate"), Inova's Chief of Clinical Enterprise Dr. Steve Motew, made clear that Inova's preexisting vaccine policy was already in compliance with the CMS Mandate. JA900.

The new application form included six probing questions for religious adherents to address, including the duration of time in which the employee held the belief that informed their objection and why the employee specifically objected to the Covid-19 vaccination if they had received other vaccinations in the past. JA65; JA85-89. Though concerned by the nature of the questions, the Employees dutifully and thoroughly answered all six questions. JA48-51; JA65-68; JA85-89.

After Inova changed its policy and required employees to reapply for exemptions, its exemption approval rate plummeted from 94% to 17% upon first review. JA905 ("370 [team members] applied for religious exemption, 66 approved after first review"). Under this new exemption process, all three Employees were denied a religious exemption. JA1370.

**B. Facts specific to Adam Netko.**

Adam Netko ("Netko") is an Information Technology ("IT") professional who was first hired by Inova in June of 2014. JA1372. At all relevant times, Netko worked from home remotely and had no physical contact with patients. JA1372.

Netko is a devout Christian and member of a conservative protestant non-denominational Bible Church. JA529-30. Prior to the creation of the COVID-19 vaccines, Netko had two experiences that galvanized his religious beliefs. First, in 2020, Netko's wife suffered a miscarriage. JA976. While Netko had previously been opposed to abortion generally, holding his own developing baby as a fetus profoundly deepened his religious conviction as to the sanctity of fetal life. JA976. Second, in 2020, Netko became a born-again Christian, after he was invited to a nondenominational church where he "had a direct encounter with Jesus Christ" and, in his words, had "been on fire ever since." JA962. Netko's experience of being "born again" is central to his religious belief and involved him incorporating "Jesus and [his] religiously conservative faith into [his] everyday life." JA976.

When Inova instituted its first Covid-19 Policy in July of 2021, Netko submitted an exemption request that included a letter from his pastor. JA529-30. His pastor noted that Netko was a "regular and active participa[nt] in [the Church's] ministry" and that Netko "held [a] religious conviction specifically against [all] vaccinations derived from the research and/or use of aborted human tissue." JA529-

30. And that "[o]ur faith maintains [the] firmly held religious believe [sic] that our bodies are the temple of the Holy Spirit. It is a God-given responsibility and requirement for us to protect the physical integrity of our body against unclean food and injections." JA529-30. Inova granted Netko's first religious exemption request on August 9, 2021. JA1373.

Around February 24, 2022, Netko received notice from Inova that it had revised its COVID-19 Policy and was requiring all employees to resubmit their religious exemption requests. In his exemption request, Netko again noted that he could not "receive a COVID-19 vaccine because [the] vaccines used cell lines originating from aborted children in their manufacturing or testing. As a Christian, I believe that life begins at conception and ends at natural death." JA66. Netko also articulated his belief that his body, as the "temple of the Holy Spirit," should not be used to further an immoral or sinful practice. JA66. For these points, Netko cited multiple passages from the Bible, which are authoritative for Christian doctrine. JA66-67.

Nonetheless, on May 13, 2022, the Committee summarily denied Netko's religious exemption, noting formulaically: "Your request did not meet the criteria for exemption, did not demonstrate a religious belief that conflicts with the vaccination requirement, or could not be accommodated in your role without posing an undue hardship to Inova's operations." JA547. Despite being an excellent

employee with no job performance issues, Netko was suspended on or about May 27, 2022, and ultimately terminated on June 22, 2022. JA1373.

### C. Facts Specific to Leanne Stynchula.

Leanne Stynchula ("Stynchula") is a registered nurse who was first employed by Inova, at its Alexandria Hospital, as a Home Health Liaison nurse beginning in July of 2016 and then as a Post Partum nurse starting in 2018. JA1373.

Stynchula is a Scientologist who also practices Christianity. JA109. Stynchula was raised as a Roman Catholic, but joined the Church of Scientology in 2001. JA1056. "For a while, [she] was practicing [both] Roman Catholicism and Scientology at the same time. But [she] stopped that . . . in the early 2000s and just mainly attend[s] services and participate[s] in services at the Church of Scientology." JA1055-56. Yet, she still "identif[ies] as Catholic" as part of her "foundational faith." JA1057.

Because of her religious beliefs, Stynchula has not taken a vaccine since 1988, and she virtually never takes medication of any kind. JA1051. The last time she "was prescribed a medication . . . was around 2005. [She] had an antibiotic." JA1053. Instead of generally relying on medicine, she relies on God, by faith, to keep her well. JA48-50. Since the beginning of her employment in 2016, Inova had granted her an exemption from all vaccines, including standard vaccines like the Flu and TDAP. JA37.

When Inova instituted its first Covid-19 Policy in July of 2021, Stynchula submitted with her exemption request a letter from her Church of Scientology Chaplain. JA99-100. Her Chaplain noted that a fundamental tenet of the Church's faith is Self-Determinism. JA100. This doctrine holds that "the individual must look, research those materials available, and then decide, on the basis of what provides the highest level of survival for herself, her family, her friends, her community, setting aside all bias and rumor, what action is best." JA100. He continued, the opposite of this teaching is "Other Determinism," which "is where others make or insist or enforce a decision or action on another which they do not, in good conscious, believe to be the correct action. It becomes the individual's responsibility to keep their own integrity and make a decision based on their own findings; not those of others." JA100. The Chaplain made explicit that "[i]t is considered a violation of [their] religious tenant [*sic*]" for a Church of Scientology member to fail to be "Self Determined…at all times." JA100. Inova granted Stynchula's first exemption request. JA1373.

After Inova notified all exempted employees of the need to reapply on February 24, 2022, Stynchula submitted an additional exemption request. JA102. Again, she reiterated her religious view on Self-Determinism and noted that it was her belief that God had "protected [her] throughout the entire pandemic" and that "[t]aking this vaccine or any vaccine…would be a sin, as it goes against my deeply felt convictions and the answers I have received in prayer." JA104.

After denying her request again on June 28, 2022, Stynchula submitted yet another exemption request. JA109-111. She clarified that "she live[s] according to th[e Church of Scientology] Creed, as well as the teachings of the Bible and the Catholic Church." JA109. Specifically, she noted that she adhered to her Church's teaching "that the spirit alone may save or heal the body" and for this "reason I cannot in good conscience receive any of the COVID shots or any other vaccination." JA109. In support for her position, Stynchula quoted passages from the Bible. JA110-111.

Stynchula explained that "honor[ing] God with [her] spirit, mind, and body" means "guard[ing] what [she] put[s] into [her] body. JA110. That includes avoiding, whenever possible, knowingly receiving foreign toxins with harmful or unknown effects, while also maximizing nutrition and cultivating a healthy natural immune system in accordance with God's design." JA110. Furthermore, Stynchula stated: "It is also my sincere religious conviction that human life begins at conception, that the sanctity of life is precious to God, and that it is morally wrong to destroy innocent human life." JA110. And "[t]he COVID injections manufactured by Moderna and Pfizer both used aborted fetal tissue in the testing process, and those manufactured by AstraZeneca and Johnson & Johnson used aborted fetal tissue in every step of the process– development, production and lab testing." JA111. For these reasons, "[i]t violates [her] Christian faith to be injected

with [such] substances." JA111. Finally, Stynchula made clear that taking the Covid-19 vaccine would "go against the moving of the Holy Spirit, [and] would be sinning and jeopardizing my relationship with God and violating my conscience." JA111.

Stynchula's exemption was summarily rejected around August 19, 2022. JA1374. Inova terminated Stynchula on September 8, 2022. JA1375.

**D. Facts Specific to Tigist Birke.**

Tigist Birke ("Birke") is a registered nurse who was first hired by Inova on October 19, 2020, and worked in the post-anesthesia care unit until Inova terminated her employment on September 30, 2022. JA1375-1377. Birke had every intention of remaining in her position, as her employment contract included a retention bonus that was contingent on her remaining with Inova through October 2022. JA988.

Birke is a devout, lifelong Ethiopian Orthodox Christian and for the past nineteen years, has been a member of the Kidst Slassie Ethiopian Orthodox Tewahdo Church. JA984. She attends services, and tithes, every Sunday. JA985. In fact, while employed by Inova, she "asked for time off to take religious holidays," such as Christmas and Easter (which fall on different dates than in the Protestant or Catholic traditions) and Passion Week, also known as Holy Week. JA986.

When Inova instituted its first Covid-19 Policy in July of 2021, Birke requested an exemption on August 31, 2021, as she objected to the vaccination(s) on religious grounds. JA1375. In her brief application, she explained that, as "Humans are made in the image and likeness of God (Genesis 1:26)," therefore "Human blood is sacred and must remain pure." JA83. Her religious objection to the vaccination was that it would be introduced to the bloodstream and change the "sacred Holy blood," based on Leviticus 17:11. JA83. Secondarily, she cited scripture for her moral culpability for allowing any unclean thing to corrupt her physical body, which was given by God "as a temple of the Holy Spirit." JA83. Inova granted Birke's first request. JA1375.

On February 24, 2022, Inova notified Birke that all exempted employees were required to reapply for their exemption. In her second exemption request, Birke noted the practice of using "aborted fetal organs or cells and cell lines" in the making of many modern-day vaccines, which made acceptance of vaccination "a total abomination to participate in this sinful act as a Christian." JA85. She quoted scriptures from the Old Testament which describe God's relationship and purposes for unborn children as persons. JA85. She then stated, "Participating or using any products derived from terminated pregnancy is considered equal to participating in the murder and destroying the image and likeness of God." JA85. Moreover, Birke articulated the belief that her body was a "temple of God" and that using a vaccine

derived from "animal parts" or "foreign DNA" would defile her body. JA85. In support of these beliefs, Birke cited Biblical passages and the writing of contemporary church fathers. JA85.

On July 21, 2022, the Committee summarily denied Birke's religious exemption request. Birke wrote a letter of appeal to the Exemptions Committee, seeking reconsideration of their denial, which again was denied. JA90-91. Inova terminated Birke on September 30, 2022. JA1377.

## SUMMARY OF THE ARGUMENT

Employees' complaints were hamstrung, from the outset of their cases, by the district court's partial grant of Inova's motion to dismiss. In the very same ruling that was recently reversed by this Court in *Barnett v. Inova Health Care Servs.*, 125 F.4th 465 (4th Cir. Jan. 7, 2025), the district court struck all beliefs other than objection to fetal cell involvement from Employees' accommodation claims, and completely dismissed their disparate treatment and state law claims. The court's later grant of summary judgment is predicated entirely on this earlier ruling. Following *Barnett*, this Court must reverse the partial grant of the motion to dismiss, which collapses the foundation of the grant of summary judgment.

Next, the district court erred in finding that there were no facts a jury could accept that Netko had maintained sincerely-held religious beliefs. The court ignored key facts including: (1) the galvanizing effect losing an unborn child had on Netko's

religious belief, (2) the impact of Netko's religious conversion in 2020 on his religious beliefs, (3) the fact that Netko has never taken a medication or vaccine that he knew was developed using fetal cells, (4) and that Netko immediately ceased using medications after learning of their connection to fetal cells. In effect, the Court ignored facts inconvenient to its ruling, thereby committing reversible error.

The district court erred in ruling that Inova's vaccine policy did not conflict with Birke and Stynchula's religious beliefs; it wrongly found "they did not believe that Novavax offended their fetal cell line beliefs" and "there is no admissible evidence establishing an issue of fact as to whether Novavax was in fact 'tested' on fetal cell lines." JA1391. The court's reasoning must be reversed for four reasons: (1) the court's analysis on summary judgment is based on its now overturned ruling on the motion to dismiss which artificially constrained the scope of the Employees' religious beliefs and undermined the reasoning that followed, (2) the Employees did believe that the Novavax vaccine contravened their religious beliefs, (3) Novavax was undisputably tested in the premarket safety testing using aborted fetal cell lines, and finally, (4) the court's reasoning was based on inadmissible hearsay to which the residual hearsay exception did not apply.

Furthermore, the court erred in ruling Stynchula lacked legitimate religious beliefs, and that she was insincere in asserting her belief opposing the use of fetal cell lines. The court's religiosity analysis is inconsistent with the law, having been

reversed in *Barnett* for the same reasons. The court's sincerity analysis ignored critical facts that would have allowed a jury to credit Stynchula's sincerity, including her choice to work as a post-partum nurse instead of in labor and delivery.

Finally, the court erred by excluding the expert opinion testimony proffered by Stynchula and Birke to establish that the Novavax vaccine was tested on fetal cells. The expert's opinion was based on reliable sources, and his primary contention was conceded by Inova's expert, a fact ignored by the court. The court applied an improper reliability analysis and an incoherent relevance analysis to determine that the expert could not rely on the reliable evidence, based on a distortion of the issue in dispute.

## ARGUMENT

### I.  STANDARD OF REVIEW.

Employees appeal the partial dismissal of their complaints, made pursuant to Federal Rule of Civil Procedure 12(b)(6). This Court applies *de novo* review to dismissal of a complaint under these circumstances, "assuming as true the complaint's factual allegations and construing 'all reasonable inferences' in favor of the plaintiff." *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017).

Likewise, Employees appeal the grant of summary judgment, which this Court reviews *de novo*. *J.S. v. Isle of Wight Cty. Sch. Bd.*, 402 F.3d 468, 473 (4th Cir. 2005). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether the district court correctly applied

the relevant substantive law and whether there are any genuine issues of material fact. *Id.*

## II. THE DISTRICT COURT FAILED TO APPLY MANDATORY PRECEDENT REGARDING RELIGIOSITY OF SINCERELY-HELD BELIEFS.

The district court's Orders on the Motions to Dismiss incorporated its bench ruling, which in turn incorporated its previous ruling in a similar case. JA241-243 (granting dismissal "for the reasons stated in open court"); JA216 (ruling that the complaint must be dismissed "for the reasons that have been set out in the *Ellison* case and that apply with equal force here"). In its oral ruling, the district court's only statement beyond the reference to *Ellison* was that recognizing the employees' sincerely-held religious beliefs "would amount to a blanket privilege and that if permitted to go forward would undermine our system of ordered liberty." JA216.

In the referenced *Ellison* ruling, the district court had ruled that those plaintiffs' claims were "not rooted in concerns that are religious in nature." JA225. Among the plaintiffs in that case whose objections to vaccination were based on prayer or various other religious beliefs, the district court ruled that those beliefs "fail[ed] to establish a sincere religious objection under the *Africa* standard," because a belief that God instructed an employee in the context of prayer not to receive the vaccination "amounts to the type of 'blanket privilege' that undermines our system of ordered liberty." JA228. The district court went on to say that, "if

14

taken to its logical extreme, [this] claim would serve as a 'limitless excuse for avoiding all . . . obligations.'" JA228.

This very same ruling that granted in part the Motions to Dismiss in these cases has already been considered by this Court. *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 2025 U.S. App. LEXIS 296, 2025 WL 37237 (4th Cir. Jan. 7, 2025) (noting that "[t]hat same day, the district court also heard cases from other similarly situated plaintiffs"); JA215. This Court reversed the court's ruling in its entirety. *Id.* (reversing and remanding because the plaintiff had "sufficiently alleged religious discrimination for all three of her claims at [that] stage"). While the court had dismissed Barnett's complaint entirely "because she did not raise abortion or fetal cells as a basis for her objection," the district court allowed Employees to proceed on accommodation claims only with regard to their claim premised on an objection to "abortion or fetal cells." JA215-216. The other religious objections stated by Employees in their applications for religious exemption were deemed non-religious and dismissed. JA216. The district court likewise dismissed Employees' disparate treatment claims and their state law claims by the same logic used to dismiss Barnett's. JA216-217.

For the reasons stated in this Court's *Barnett* ruling, these rulings by the court on religiosity, disparate treatment, and state VHRA claims must be reversed. In determining whether beliefs are religious, the district court's inquiry should have

been limited to determining whether "the beliefs professed are, in the claimant's own scheme of things, religious," bearing in mind that "the claim of the adherent that her belief is an essential part of a religious faith must be given great weight." *Barnett*, 2025 U.S. App. LEXIS 296 at *9 (*quoting Patrick v. LeFevre*, 745 F.2d 153, 157-58 (2d Cir. 1984)) (internal marks omitted).

In like manner, Employees provided detailed explanations of their specific religious beliefs that prohibited them from receiving the COVID-19 vaccine. *See supra* at 2-11; *infra* at 29-31. This Court has ruled that such explanations are sufficient to demonstrate that their beliefs are "an essential part of a religious faith," and are "plausibly connected with [their] refusal to receive the COVID-19 vaccine." *Barnett* at *11, quoting *Patrick*, 745 F.2d at 157-58.

A. *Barnett*'s Implications for Employees' Disparate Treatment and VHRA Claims

This Court's ruling in *Barnett* likewise has direct application on the district court's dismissal of the Employees' disparate treatment and state law claims. Each of the Employees' complaints addressed claims and fact scenarios similar to Barnett's complaint. The reversal of the district court's dismissal of those claims in Barnett's complaint can thus be directly applied to the claims asserted by the Employees.

To plead a disparate treatment claim under Title VII, the Employees' complaints were not "subject to a heightened pleading standard," and needed only

to allege facts "supporting a reasonable inference of discriminatory intent," that Inova treated each of the Employees differently than other employees "because of [their] religious beliefs." *Barnett* at \*11-\*12.  Similarly, pleading a state law claim under the VHRA required the Employees to allege that they were "discharge[d], or otherwise discriminate[d] against [] with respect to [their] religion."  Va. Code Ann. § 2.2-3905(B)(1)(a).

In *Barnett*, this Court ruled on allegations that resemble the ones found in the Employees' complaints, and concluded there that the "allegations are sufficient to state disparate treatment claims under Title VII and the VHRA at [the pleadings] stage." *Barnett* at \*12.  This Court first addressed that "the district court erred by dismissing both claims due to finding the claims 'duplicative' with Barnett's reasonable accommodation claim under Title VII, as a plaintiff may 'plead[] multiple or alternative claims based on the same facts.'" *Id.* (quoting *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 696 (4th Cir. 2018)).  Next this Court examined Barnett's factual allegations, and determined that the facts she alleged "support[ed] a reasonable inference of discriminatory intent." *Barnett* at \*13. Reviewing the allegations of the complaint, this Court ruled they "sufficiently demonstrate that INOVA treated her differently than other employees because of her religious belief, and thus, support a reasonable inference of discriminatory intent," and thus that "the district court erred in summarily dismissing Barnett's disparate

treatment claims under Title VII and the VHRA." *Barnett* at *13-*14. These were similar to allegations found in Employees' complaints, inasmuch as Inova committed the same intentional discrimination, and the district court's dismissal of those claims must be reversed. JA34-47; JA52-64; JA69-82.

B. I<small>MPLICATIONS OF REVERSAL OF DISTRICT COURT'S GRANT OF MOTION TO</small> D<small>ISMISS UPON THE LATER GRANT OF SUMMARY JUDGMENT.</small>

In granting the Motions to Dismiss, the district court wrongly narrowed the scope of the Employees' cases to the one sincerely-held religious belief the court deemed legitimate (abortion-related fetal cell objections). This stricture terminated in the Novavax vaccine *cul-de-sac*, since—within the erroneous reasoning of the district court—that vaccine eliminated fetal cell concerns. JA1391-1394. The district court's view of the Novavax vaccine is wrong, for the reasons noted herein, but even if not, the court's summary judgment is now inexorably flawed, since the resurrection of the Employees' additional claims negates the mootness resolution by the Novavax vaccine imagined by the court. *See infra* at 29-31. In sum, the court could not have granted summary judgment against Employees on their one remaining claim for relief if the rest of their claims had not already been wrongfully taken from them by the court's prior dismissal.

Applying *Barnett*, therefore, demands reversal of the summary judgment ruling and requires remand, to give the Employees the opportunity to pursue the full breadth of their claims against Inova.

## III.  NETKO ACTED IN ACCORDANCE WITH HIS SINCERELY HELD RELIGIOUS BELIEFS.

As this Court has recently held, "the inquiry into sincerity is 'almost exclusively a credibility assessment' and 'can rarely be determined on summary judgment.'" *Barnett* at *10 (quoting *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007)).  Because "[c]redibility issues such as the sincerity of an employee's religious belief are quintessential fact questions . . . they ordinarily should be reserved 'for the factfinder at trial, not for the court at summary judgment.'"  *EEOC v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De P.R.*, 279 F.3d 49, 56 (1st Cir. 2002) (quotations omitted).

By relying on "circumstantial evidence" cherry picked exclusively by Inova, the district court misstated the record in two critical respects: (1) that Netko had no evolving religious beliefs because he was a lifelong Catholic, and (2) that Netko strayed "100 percent" of the time from his stated religious belief.  JA1382-1383.  Both of these findings are irreconcilable with the record; in fact, to even arrive at these conclusions, the court completely disregarded several exhibits, most notably Netko's declaration and deposition testimony.  JA1379-1383.  Because a fair-minded jury could have found Netko maintained sincerely held religious beliefs, the court erred in substituting his own judgment for that of the jury's.

A. <u>NETKO MAINTAINED EVOLVING RELIGIOUS BELIEFS GALVANIZED BY THE LOSS OF HIS UNBORN CHILD AND CONVERSION EXPERIENCE.</u>

By treating Netko's religious belief as static, the trial court improperly disadvantaged Netko for actions that occurred before his beliefs evolved and matured in 2020. *See, e.g.*, JA1380 (noting that Netko took the TDAP vaccine in 2016, years before his religious conversion).

In essence, the trial court whitewashed Netko's religious beliefs on abortion after 2020 because Netko "remained part of the Catholic church until 2020," and therefore "the relevant beliefs he claims are not new and yet they were not well observed after Netko made his religious exemption requests and especially not before." JA1382. In doing so, the district court ignored two key facts: (1) In 2020, Netko's religious beliefs on abortion were catalyzed by his experience of losing his own child after his wife's miscarriage and holding the lifeless fetus in his hands (JA976); and (2) in 2020 Netko had a conversion experience leading to deeper and more personal religious convictions (JA956-962).

First, Netko's "religious conviction against abortion was galvanized by the experience of holding [his] tiny, lifeless baby in [his] hands." JA976. ***Critically, this fact was completely absent from the court's analysis***. In 2020, while attending a "Bible-based church and incorporating Jesus and [his] religiously conservative faith into [his] everyday life," Netko's wife suffered a miscarriage. JA976. While Netko had previously been opposed to abortion generally, holding the deceased fetus

sharpened his religious conviction on the sanctity of fetal life. JA976. Critically, the district court gave zero analysis or even recognition to this fact. JA1379-1383. Instead, the court summarily concluded that since Netko was a Catholic prior to 2020, "the relevant beliefs he claims are not new." JA1382. A reasonable jury could find that the experience of holding your deceased, unborn child could have a formative effect on Netko's religious belief.

Second, the court downplayed the impact of Netko's religious conversion in 2020 by remarking that Netko "was born and raised Catholic" and "held his beliefs concerning . . . abortion [for his entire] . . . 'adult life.'" JA1382. Again, while Netko was indeed opposed to abortion prior to his 2020 conversion, the court's analysis assumes that his conviction in that belief was unchanged. But an individual's religious views are dynamic and can change over time. *See EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir.1997) (Jewish employee's request of vacation to observe Yom Kippur was sincere, even though she had not requested vacation for that holiday in the previous eight years). For example, in *Ilona*, the plaintiff was not "particularly religious" and did not observe other religious holidays, but was motivated by personal reasons for greater observance and was thus found to be sincere in her religious beliefs. *Id.* The same can be said of Netko, whose life experience in the years immediately preceding the updated vaccination policy had led to a deeper religious conviction, especially

regarding abortion and using aborted fetuses in medical products. *See* JA976; JA1431-1433.

Here, Netko states that he first became a born-again Christian in 2020 (JA956), after he was invited to a nondenominational church where he "had a direct encounter with Jesus Christ." JA962. Netko's experience being "born again" is central to his religious belief and involved him incorporating "Jesus and [his] religiously conservative faith into [his] everyday life." JA976. It was arbitrary for the court to so lightly disregard Netko's religious experience as "not new." JA1382. A reasonable jury could have found that Netko's conversion experience in 2020 influenced his religious beliefs on unborn life.

Ultimately, the practical effect of the court glossing over Netko's evolving religious views is that it prejudiced Netko for acts that occurred long before his conversion. JA1380 (noting that Netko took the TDAP vaccine in 2016, years before his religious conversion).

B. NETKO REFRAINED FROM TAKING ANY VACCINE OR MEDICINE THAT HE KNEW WAS DEVELOPED USING FETAL CELLS.

Next, the district court completely ignored important portions of the record, deciding that Netko "strayed one hundred percent of the time" from his stated religious beliefs by taking vaccines and medications which, unknown to Netko, were developed using fetal cells. JA1383. This overreach is flatly contradicted by the record.

First, after Netko became aware that a medication or vaccine was developed using fetal cells, he "immediately stopped taking them due to [his] religious belief." JA975. For instance, after Netko learned through his own research that ibuprofen and omeprazole were developed using fetal cells, he immediately stopped taking them. JA952-955. At the time of taking these medications, Netko was "totally unaware that fetal cells were involved." JA974. If Netko did not know that those medications and vaccinations involved fetal cells, and received them in ignorance, that is not behavior that is markedly inconsistent with his stated beliefs. See *Thacker v. Dixon*, 784 F. Supp. 286, 292 (E.D.N.C. 1991) (holding that sincerity is a subjective question pertaining to the party's mental state).

Critically, there is no evidence in the record of Netko knowingly taking medications or vaccines that were developed using fetal cells. Instead, the court faulted Netko for being, in the court's assessment, too "unquestioning" before taking a product. JA1382. The court then equated its opinion as to the appropriate level of scrutiny Netko should have applied with "circumstantial evidence" as to his subjective mental state. JA1381. This is erroneous for two reasons.

First, Netko performed his own research on whether medical products were developed using fetal cells. JA952-955. It is false to portray Netko as indifferent to that inquiry. Second, Netko is a non-medical layperson and still learning about the use of fetal cells in various medical products. As is likely true of most people, he

"never would have imagined that medications and vaccinations had been using cell lines from aborted babies. I found it unfathomable, and could not believe this was more widely known." JA975. According to Netko, "now that I know there are many more vaccines and medications with fetal cell line involvement, I have become a lot more aware and diligent." JA976.[1]

Second, the court noted that Netko answered "no" on a questionnaire from his physician asking if he had "any religious or cultural factors that you would like us to take into account when planning your healthcare." JA1427. However, the court ignored that Netko did not understand this question to encompass his objection to certain vaccines. JA967-970; JA975-976 ("I understood this to mean highly specific religious practices, like a Muslim woman not wishing to be seen by a male doctor"). Moreover, there is no reason to infer that Netko would need to seek a religious accommodation from his doctor, since his doctor could not require any medical treatment against his will, nor threaten his employment, unlike Inova.

This scenario is similar to *Varkonyi v. United Launch All., LLC*, No. 2:23-cv-00359-SB-MRW, 2024 U.S. Dist. LEXIS 31679, at *9 (C.D. Cal. Feb. 21, 2024), in

---

[1] For the sake of argument, even if Netko had knowingly taken vaccines or medications developed using fetal cells, "a sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?" *Chen v. Holder*, 583 F. App'x 164, 168-69 (4th Cir. 2014) (quoting *Singh v. Holder*, 720 F.3d 635, 644 (7th Cir. 2013)).

which the defendant claimed that the plaintiff's "lack of objection to other medications and vaccines developed using aborted fetal cell lines is inconsistent with his objection to the COVID-19 vaccine. Ruling for the employee, that court noted that, "while [the plaintiff] previously had taken other vaccines and medications developed with aborted fetal cell lines, he purportedly was unaware of this fact at the time." *Id.* at \*10. Regardless, "[a] court generally may not discount a plaintiff's religious belief based on the court's determination that the belief is inconsistent;" rather, "what matters is whether the position is based on an honest conviction." *Id.* at \*9 (citing *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715-16 (1981)).

By contrast, the district court's reliance on *Gardner-Alfred v. FRB of N.Y.*, No. 22-cv-1585 (LJL), 2023 U.S. Dist. LEXIS 171012 (S.D.N.Y. Sep. 25, 2023) is misplaced. There the plaintiff provided no facts that she was a member of the religion to which she claimed adherence, and "offer[ed] only a 'conclusory assertion' that her professed religious belief was anything more than one adopted for the purpose of avoiding what she believed (not on the basis of religion) to be an inconvenient obligation, and one which was abandoned after it was invoked to avoid that obligation." *Id.* at \*49. There are no facts in the record to establish that Netko's Christian religion was contrived for the sake of avoiding vaccination, or that he knowingly acted inconsistent with that religion. Indeed, as acknowledged by the

court, "no one contends that Netko is not a Christian or does not hold religious beliefs in general." JA1383.

Better analysis of sincerity was applied in *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 791 (5th Cir. 2012) (holding that sincerity is "fact-specific and requires a case-by-case analysis," reversing the district court which "improperly weighed the evidence proffered by [defendant] more heavily than it did [plaintiff's]"). There, the court found that the plaintiff, whose claimed religion required a special diet, bought nonkosher food at the prison commissary, and that he had not requested a facility transfer when he could have. *Id.* The Fifth Circuit reversed, ruling that, "[a] finding of sincerity does not require perfect adherence to beliefs expressed by the plaintiff," and a plaintiff does not "forfeit his religious rights merely because he is not scrupulous in his observance." *Id.* at 791-92 (*quoting Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012)).

In weighing the "circumstantial evidence" selected by Inova, the court wrongly found that "no reasonable juror could conclude that [Netko's] objection to the COVID-19 vaccine sincerely arises out of [his religious] beliefs." JA1383. But, to arrive at this skewed conclusion, the district court was forced to ignore several key facts including: (1) the galvanizing effect losing an unborn child had on Netko's religious belief, (2) the impact of Netko's religious conversion in 2020 on his religious beliefs, (3) the fact that Netko has never taken a medication or vaccine that

he knew was developed using fetal cells, (4) and that Netko immediately ceased using medications after learning of their connection to fetal cells.  JA973-976.

Viewing the entire record, this case presents quintessential fact questions left unresolved.  Because a reasonable jury could have found that Netko maintained sincere religious beliefs, the court erred in substituting its own judgment for that of the jury's and should be reversed.

### IV.  BIRKE AND STYNCHULA MAINTAINED RELIGIOUS BELIEFS THAT CONFLICTED WITH THE USE OF THE NOVAVAX VACCINE.

On summary judgment, the district court held that Stynchula's and Birke's religious beliefs did not conflict with Inova's vaccine policy because "they did not believe that Novavax offended their fetal cell line beliefs" and "there is no admissible evidence establishing an issue of fact as to whether Novavax was in fact 'tested' on fetal cell lines."  JA1391.

The court's reasoning is flawed for four reasons: (1) the court's analysis on summary judgment is based on its now overturned ruling on the motion to dismiss which artificially constrained the scope of the Employees' religious beliefs and undermined the reasoning that followed, (2) the employees did believe that the Novavax vaccine contravened their religious beliefs, (3) Novavax was indisputably tested in the premarket safety testing using aborted fetal cell lines, and finally, (4) the court's reasoning was based on inadmissible hearsay to which the residual hearsay exception did not apply.

A. **THE DISTRICT COURT'S ANALYSIS OF NOVAVAX AS AN ACCOMMODATION IS PREMISED ON ITS EARLIER DECISION ALREADY OVERRULED BY THIS COURT.**

This Court, along with the First, Sixth, Seventh, and Eighth Circuits, has ruled that beliefs like those articulated by Birke and Stynchula are religious for purposes of surviving a motion to dismiss. *See Thornton v. Ipsen Biopharmaceuticals, Inc.*, No. 23-1951, 2025 WL 2115172025, U.S. App. LEXIS 1049, at *15-*16 (1st Cir. Jan. 16, 2025). In *Barnett*, this Court expressly found the employee's allegations that "receiving the vaccine would be sinning against her body, which is a temple of God" and that "it would be sinful for her to engage with a product such as the vaccination after having been instructed by God to abstain from it" were sufficient to survive a motion to dismiss because they are "plausibly connected with [Barnett's] refusal to receive the COVID-19 vaccine"). 2025 U.S. App. LEXIS 296 at *11.[2]

As already noted (*supra* section II), the district court's analysis of whether Novavax conflicted with Stynchula's and Birke's religious beliefs was entirely premised on its (erroneous) earlier ruling on the motion to dismiss (now overturned by *Barnett*), which had artificially truncated the scope of their religious beliefs.

---

[2] *See also Sturgill v. Am. Red Cross*, 114 F.4th 803, 810-11 (6th Cir. 2024) (same); *Passarella*, 108 F.4th at 1007-08 (reversing grant of motion to dismiss where plaintiffs objected to the vaccination requirement because, among other things, their beliefs that their body is a temple of God and would be violated by the COVID-19 vaccine); *Ringhofer*, 102 F.4th at 902 (holding that plaintiff's belief that "her body is a temple" was sufficient to survive a motion to dismiss because she "connect[ed] her] objection to [COVID-19] testing to specific religious principles").

JA216. Even assuming that the Novavax vaccine was not tested using fetal cell lines — a highly disputed fact question — it still would have conflicted with Birke and Stynchula's religious beliefs if those had been analyzed in full. Like a wobbling Jenga tower, once the wooden block of the court's reasoning on the motion to dismiss is removed, the entire structure crumbles.

### a. Novavax conflicted with Birke's religious beliefs.

Birke is a member of the Ethiopian Orthodox Tewahdo Church. JA658. Initially, Birke maintained the following religious beliefs, *inter alia*, that conflicted with Inova's Policy: (i) her body was a "temple of God" and that using a vaccine derived from "animal parts" or "foreign DNA" would defile her body, (ii) she was pro-life based on her understanding of scripture and thus the vaccines' connection to fetal cell lines prohibited her from taking any of them, and (iii) various saints' or church fathers' writings on vaccines, likewise prohibited her from taking it. JA665-666.

In order to find that Novavax presented no conflict with Birke's religious beliefs, the court relied on Inova's advertisement for Novavax. JA1393 (*citing* JA400-410). In the sentence immediately following the excerpt cited by the court, the notice states "Novavax uses ***moth cells*** to make the spike proteins." JA402. Likewise, another Inova pamphlet, titled "Novavax COVID-19 Vaccine Overview," addresses "faith-based concerns" by stating "Novavax uses ***moth cells*** to make the

spike proteins." JA398. Had the court not disregarded Birke's religious belief about her body being a "temple of God" that would be violated by using a vaccine derived from "animal parts," such as moth cells, there would be no question that Novavax resolved nothing. It does not matter if "Novavax would be appealing for those with fetal cell objections" given that it was instead developed using moth cells—something Birke explicitly rejected. JA1393.

### b. *Novavax conflicted with Stynchula's religious beliefs.*

Stynchula identifies as a "Christian Scientologist." JA822. She lives according to the Creed of the Church of Scientology ("Creed"), written by L. Rob Hubbard in 1954, "as well as the teachings of the Bible and the Catholic Church." JA822. n accordance with these religious texts, Stynchula maintained the following religious beliefs, amongst others, that conflicted with Inova's Policy: (1) it is the sole prerogative of the "Spirit to heal the body"; (2) the use of fetal cells in the production of the vaccine is a violation of the sanctity of life; (3) divine directives received in prayer are religious beliefs; (4) and as the "Temple of God," the physical body may not be used as a vehicle for immorality. JA822-824.

Based on her understanding of these religious beliefs, Stynchula refrains from taking all vaccines, a religious practice she has maintained *for over 30 years*. JA822. Stynchula told Inova that she could not in "good conscience receive any of the COVID shots or any other vaccination" because she follows the Creed, which holds

"that the Spirit alone may save or heal the body." JA822-823. Instead of generally relying on medicine, she relies on God, by faith, to keep her well, and she believed "[God] had protected [her] throughout the entire pandemic." JA810-811. She has not taken a vaccine since *1988* and "she virtually never takes any medication of any kind." JA810-811. Further, "all four of her children did not receive vaccines and were granted religious exemptions for the requirements of their schools." JA810-811. She attributes her ongoing health and safety to God, who "has not let [her] down yet." JA810-811. As with Birke, had the court not artificially constrained Stynchula's' religious beliefs, Novavax was a futile accommodation.

Ultimately, the district court's error on the motion to dismiss fundamentally undermines its analysis as to the acceptability of the Novavax vaccine on summary judgment. Because the court's reasoning is inherently flawed, having placed the Employees' religious beliefs under a contrived microscope, this Court should reverse.

B. BIRKE AND STYNCHULA BELIEVED THAT THE NOVAVAX VACCINE VIOLATED THEIR RELIGIOUS BELIEFS.

The court found that Birke and Stynchula "did not actually know whether a conflict existed between [their] stated religious beliefs and Inova's IPP vis-a-vis the Novavax vaccine." JA1395. However, by the time Inova announced the addition of Novavax to its list of approved vaccines, both Birke and Stynchula had already submitted their exemption requests and appeals, describing several religious

objections to the COVID-19 vaccine. Even if Novavax resolved one of their several stated religious objections, it did not address the entirety of their religious objections. For that reason alone, there was no reason to voice another religious objection specifically to Novavax as violating the fetal cell objection.

Moreover, by the time Inova announced the availability of Novavax, Birke and Stynchula had already been informed that Inova's decision to deny their exemption was "final." On August 17, 2022, Inova announced the availability of Novavax by mass email. JA1392. However, two weeks before, Inova notified Stynchula of its "final" decision to deny her exemption on August 5, 2022. JA1395, n.14. Likewise, Inova notified Birke of its "final" decision to deny her exemption on August 19, 2022. JA1394. Considering the timing, it was reasonable for them to presume that submitting a religious objection to the Novavax vaccine was a dead-letter. Additionally, Inova had specified that its decision was "final," unlike prior denial notices that welcomed "additional information." JA677; JA818. Thus, the court's assertion the Birke and Stynchula "frustrate[d] Inova's attempt at 'cooperation in the search for an acceptable reconciliation'" is baseless. JA1398.

Regardless, the court's assertion is still disputed by the record. Birke testified she did "not trust" Novavax's claims that its COVID-19 vaccine had no connection to fetal cells because "it was [originally] stated that [Moderna and Pfizer] don't have

anything to do with fetal cells, and then, later on, it came out that they use that."[3]

JA638-639. In other words, "it was sometime after [the other COVID vaccines were released] that it was known that they used fetal tissue as testing for their vaccine." JA637-638. In fact, when she submitted her August 2021 exemption request, she believed some news media sources were claiming that "Pfizer and Moderna d[id]n't contain any artificial tissue – d[id]n't have any connection with that," so that is why "she formulated [her exemption request] based on the other beliefs." JA593-594.

Likewise, Stynchula "knew that Novavax had some fetal cell issues that [she] couldn't get clarification on" despite "digging all over trying to find clarification to see if [fetal cells] w[ere] involved in it or not," and that she "want[ed] to get the answers directly from the researchers and not from a third party . . . [like] Inova." JA1065; JA1067.

C. NOVAVAX'S COVID-19 VACCINE WAS IN FACT TESTED USING FETAL CELL LINES.

Birke and Stynchula—through their expert witness James L. Sherley, M.D., Ph.D.—offered evidence that the Novavax vaccine does have a material connection

---

[3] Perhaps Birke was referring to articles like these: Strauss, Valerie, Washington Post, "No, covid-19 vaccines aren't made from aborted fetuses – and more lessons about fake news" (Dec. 8, 2020), available at https://www.washingtonpost.com/education/2020/12/08/no-coronavirus-vaccines-arent-made-aborted-fetuses-or-created-control-population-more-lessons-about-fake-news/

to fetal cell testing.[4]  In fact, Inova's expert admits as much: "The article Dr. Sherley cites seems to indicate that the Novavax COVID-19 vaccine was tested in [fetal] cells." JA1136.

Dr. Sherley explained that while the Novavax Vaccine did not utilize fetal cells in the production/manufacturing stage, they were utilized in at least two ways in the "post production phase."  JA909.  First, Novavax Vaccine was tested to compare the structural elaborations of the SARS-CoV-2 spike protein produced in the Sf9 insect cells versus those of the spike protein produced in human embryonic kidney HEK293F cells.  JA910.  Second, the efficacy of the Novavax Vaccine was tested using a pseudo virus created with the use of HEK293 cells.  JA910.  The peer-reviewed article that summarized that research discloses that the research was funded by Novavax (*inter alios*).  JA910.  And these tests played a key role in "bringing the vaccine to market" because "[u]nder market and industry standards, . . . this testing was integral to the FDA approval and marketability of the Novavax vaccine as it was offered to the public."  JA911.

In summary, "fetal cells were substantially involved in the quality testing of Novavax vaccine."  JA911.  Therefore, the court erred by finding there was no evidence in dispute on the issue.

---

[4] For admissibility of Dr. Sherley's opinion, *see* section VI, *infra*.

D. THE DISTRICT COURT'S ANALYSIS WAS BASED ON INADMISSIBLE HEARSAY, AND THE RESIDUAL EXCEPTION TO THE HEARSAY RULE DOES NOT APPLY.

To rebut the qualified and reliable opinion of Dr. Sherley, which he verified by declaration, the court relied on only two pieces of evidence,[5] which the court wrongly credited as trustworthy. JA1399. Inova's evidence consisted of two private, hearsay communications sent from Novavax to Inova. JA392; JA894-896. The first, an e-mail sent via cell phone, from what the court termed a "Novavax research executive," states the following:

> This is nonsense. Given that all life on Planet Earth emerged from the same source during the Big Bang, there' s no surprise that similarities can be found. The bottom line [is] that no human cell lines have been used in the development, manufacture, testing or release of the NVX' 2373 vaccine. Please don't waste any more time on this stuff.
>
> Lisa
> Sent from my Verizon, Samsung Galaxy smartphone

JA1399 (citing JA392). Somehow, the court found this third-party email had "sufficient guarantees of trustworthiness." JA1399.

Likewise, the second communication (JA894-896), was a press release Novavax sent to Inova to assist in marketing the vaccine. JA1399. Again, the court applied the residual hearsay exception, mischaracterizing the Exhibit as a public statement, and found it was admissible over objection. JA1398.

---

[5] Neither document was sworn to or certified by Inova, and neither of the declarants (the authors of the correspondence) were proffered as witnesses in the case. See ECF 37.

"[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Lyons v. City of Alexandria*, 35 F.4th 285, 290 n.4 (4th Cir. 2022) (quoting *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)). And "the residual hearsay exception 'was meant to be invoked sparingly.'" *Cisson v. C.R. Bard, Inc. (In re C.R. Bard, Inc.)*, 810 F.3d 913, 925 (4th Cir. 2016) (quoting *United States v. Heyward*, 729 F.2d 297, 299-300 (4th Cir. 1984) ("It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances").

Here, the district court provided zero explanation for why an informal, dismissive email sent via a cell phone has the "sufficient guarantees of trustworthiness." USCS Fed Rules Evid R 807(a); JA1399; *contrast with United States v. Clarke*, 2 F.3d 81 (4th Cir. 1993) (admitting testimony where it had several guarantees of trustworthiness, such as being under oath, subject to cross-examination, and recorded contemporaneously). Even worse, though, was the court's broad finding that any communications created by "a publicly traded company subject to securities laws…have sufficient guarantees of trustworthiness." JA1399[6]  While companies such as Enron would no doubt appreciate this

---

[6] The court relies for support on the 9th Circuit's decision in *Hal Roach Studios, Inc. v. Richard Feiner & Co*., 896 F.2d 1542, 1552 (9th Cir. 1989), but there the document found trustworthy was filed by Securities lawyers with the SEC. A far different matter than an internal "Fact Sheet" created to sell a product.

endorsement, it does not follow the law in this circuit. In fact, this Court has already held that "assertion[s] made by the self-interested manufacturer [are] hardly the best evidence," and as such, residual hearsay exceptions should not be granted to such documents. *Cisson*, 810 F.3d at 925.

Likewise, the court provides no explanation as to why this information was "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." *Id.* "Exceptional circumstances" that might warrant the residual exception are situations where "a child sexual abuse victim relates the details of the abusive events to an adult." *United States v. Peneaux*, 432 F.3d 882, 893 (8th Cir. 2005); *See United States v. Gallardo*, 970 F.3d 1042 (8th Cir. 2020); *See also United States v. Dunford*, 148 F.3d 385 (4th Cir. 1998). No "exceptional circumstances" exist here, and the court cited none.

Finally, even when the rule might apply, "a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant." Fed. R. Ev. 807(b). Inova did not satisfy the express notice and disclosure prerequisites of the rule and for that independent reason, the court erred in allowing this evidence to be admitted.

# V. STYNCHULA'S BELIEFS WERE BOTH RELIGIOUS IN NATURE AND SINCERE.

Another basis for the district court's dismissal of Stynchula's one remaining claim was that her explanation of that belief seemed secular, and not religious to the district court. JA1383. To meet the summary judgment standard, the court ruled that, "[t]here can be no dispute that Stynchula's reasons for refusing the COVID vaccines are secular, not religious, in nature." JA1384.

## A. STYNCHULA'S BELIEFS WERE RELIGIOUS IN NATURE.

To reach its conclusion, the court had to rely on legal reasoning that has been soundly rejected by this Court and indeed, by a majority of its sister Circuits. The district court followed a line of cases that was considered and rejected by this Court in *Barnett*, cases that rely on the inapposite framework of *Africa v. Commonwealth of Pennsylvania*, 662 F. 2d 1025 (3d Cir. 1981). JA1384.

*Africa* did not involve employment discrimination in the Title VII context, and does not even address what *beliefs* are to be qualified as religious. Instead, the case addressed only whether a novel belief system espoused by certain prison inmates qualified as a religion. *Africa* at 1032-36. Importantly, the "*Africa* test" aims to categorize an entire belief system as a religion and is, therefore, orthogonal to the question of whether individual beliefs are religious. Whereas particular religious beliefs will apply to certain contexts (*e.g.*, whether God allows a certain vaccination), a religion is not particularized, but a broad belief system. *Africa* at

1035.  Since there is no dispute in this case that Catholicism or Scientology qualify as religions, *Africa* is entirely immaterial to the issue presented in this case: whether Stynchula's specific beliefs that opposed the vaccination requirement were religious in nature.  *Africa* discusses what makes a collection of connected, systemic beliefs into a religion, not what makes a specific belief religious.

Unsurprisingly, the district court's application of the *Africa* religion test to Stynchula's discrete religious beliefs resulted in an incoherent result.  Stynchula's specific religious beliefs about the specific question of whether she should receive the Covid-19 vaccination do not 'address fundamental and ultimate questions having to do with deep and imponderable matters' and are not 'comprehensive in nature.'"  JA1384.  Had Stynchula's beliefs been "imponderable" or "comprehensive in nature," they likely would not have been specific to address the question of whether she should receive the vaccination.

This Court has never adopted the restrictive analysis employed in *Africa* for defining either religion or religious belief, not in the prison inmate context, and certainly not in the employment discrimination context.  *See Barnett*; *see also Dettmer v. Landon*, 799 F.2d 929, 931 (4th Cir. 1986); *Mickle v. Moore (In re Long Term Admin. Segregation of Inmates Designated As Five Percenters)*, 174 F.3d 464, 468 (4th Cir. 1999) (relying on *Thomas*, 450 U.S. at 714 and *Patrick*, 745 F.2d 153.  The only reference to *Africa* by this Court was in an unpublished decision

acknowledging that the Third Circuit "assess[ed] whether a locally practiced belief system called MOVE was religious in nature." *Doswell v. Smith*, No. 94-6780, 1998 U.S. App. LEXIS 4644, at *10 (4th Cir. Mar. 13, 1998).

In *Barnett*, this Court was directly presented the opportunity to apply the *Africa* standard, but chose instead to follow the more expansive approach to interpreting religious beliefs from the Second Circuit's ruling in *Patrick*. *Barnett* at *9-*11. Unlike *Africa*, the *Patrick* standard is focused on religiosity of beliefs, not on defining what constitutes a religion:

> Properly cognizant of the judiciary's incapacity to judge the religious nature of an adherent's beliefs, courts have jettisoned the objective, content-based approach previously employed to define religious belief, in favor of a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system."

*Patrick*, 745 F.2d at 157 (citations omitted). The repeated citation to *Patrick* within the *Barnett* opinion, and the absence of any endorsement for the district court's adherence to *Africa*, demonstrate this Court's acceptance of the broader approach to individuals' religious beliefs and practice. The district court failed to apply the law of this Circuit to this case.

As a consequence, the district court viewed Stynchula's beliefs on vaccinations by an erroneous standard. To qualify as religious, a belief for which religious accommodation is sought need only be "plausibly based at least in part on some aspect of their religious belief or practice." *Passarella v. Aspirus, Inc.*, 108

F.4th 1005, 1007 (7th Cir. 2024). In *Passarella*, the employee based her religious exemption request on the need to "follow the message that God has given me not to receive the vaccine." *Id.* She also expressed concern that "the vaccines could pose a danger to my body," and "[t]his concern, combined with her religious beliefs, leads to her conviction that God [did] not want her to receive the vaccine." *Id.* The Seventh Circuit ruled that an employee "may object to an employer's vaccine mandate on both religious and non-religious grounds—for example, on the view that receiving the vaccine would violate a religious belief *and* implicate health and safety concerns." *Id.* at 1009 (emphasis in original).

Having already (erroneously) invalidated the other religious beliefs Stynchula detailed in her applications for exemption at the pleadings phase, the district court's Order granting summary judgment declared irreligious the last of her religious beliefs opposed to the COVID vaccinations. As with the employee in *Lucky v. Landmark Med. of Mich., P.C.*, 103 F.4th 1241, 1243 (6th Cir. 2024), Stynchula alleged and offered unrebutted evidence that "she has a religious objection to vaccines of any kind." Stynchula had not received a vaccination in over 30 years because of this longstanding and sincere religious objection. JA1235. "No further 'enhancement' was necessary" and Stynchula's evidence of her longstanding "refusal to receive the vaccine was an 'aspect' of her religious observance or belief." *Id.* As was true in *Lucky*, "the district court [lacked] any basis for its insistence that

Lucky explain how 'her religion has a specific tenet or principle that does not permit her to be vaccinated.'" *Id.* (*quoting Hernandez*, 490 U.S. at 699).

Though the district court was aware of recent rulings from other Circuit Courts of Appeals addressing religiosity of requests for religious exemption from vaccination requirements, all of which had ruled in favor of a broad interpretation of religiosity (*see Passarella*, *Lucky*, and *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 898 (8th Cir. 2024)), the court ignored these rulings, choosing instead to follow district court rulings that had taken a narrow view, mostly relying on *Africa*. JA1384-1386.  Following that approach, the court ruled that Stynchula's beliefs were not religious, but were instead "isolated moral teachings in lieu of a comprehensive system of beliefs about fundamental or ultimate matters."  JA1385. This misguided approach results in predictable confusion between individuals' religious beliefs, vis-à-vis the teachings, tenets, or dogmas of specific religions, or religions as a whole.  Although the clear rulings from sister Circuits should have been sufficiently persuasive precedent at the time, *Barnett* is now binding and mandatory precedent in which this Court rejected that approach.  *Barnett* at *10.

In addition to applying a legally erroneous standard, the district court's ruling on summary judgment was incoherent within the factual context of this case. However, even this factual error was driven by the contrivance of the earlier dismissal of Stynchula's religious beliefs:  "Because the Court permitted her claim

to proceed only to the extent it is based on her sincerely held religious objections to the use of fetal cells in the development of Covid-19 vaccines . . . Stynchula's fetal cell line beliefs are the only appropriate focus of the inquiry." JA1384 (cleaned up). It is only in that context that the district court could rule that a belief (referenced from specific teaching by the Church of Scientology) that "the spirit alone may save or heal the body" is not a religious belief. JA1385.

Similarly, the district court rejected as secular Stynchula's beliefs that her "body is a gift from God," that receiving the vaccination "would be a sin" that would "impact [her] relationship with God," and went "against [her] deeply felt convictions and the answer [she] ha[s] received in prayer." JA1386. These sorts of articulations of religious belief were precisely the sort that were ruled to be religious in *Passarella*, *Lucky*, *Ringhofer*, and, finally, *Barnett*. *See Thornton v. Ipsen Biopharmaceuticals, Inc.*, No. 23-1951, 2025 WL 2115172025, U.S. App. LEXIS 1049, at *15-*16 (1st Cir. Jan. 16, 2025) (summarizing cases). And yet the district court concluded that "there can be no genuine issue as to the secular nature of Stynchula's vaccination objections." JA1389. The district court's analysis was erroneous.

Lastly, the court faulted Stynchula for bringing up other religious objections in her summer 2021 and March 2022 exemption requests, and only including her objection to fetal cells in her July 2022 exemption appeal. JA1387-1388. The

district court viewed this as an "attempt [to] incorporat[e] by reference [] her fetal cell concerns to her earlier, more generalized exemption requests." JA1388. The district court did not explain why that made her beliefs irreligious, but once again conflated religiosity with sincerity. JA1385. Again, this limited focus on fetal cell objections, to the exclusion of all her other religious beliefs, is only applicable because of the improper dismissal of those other beliefs earlier, at the pleadings stage. The district court's analysis required Stynchula, in early 2022, not to have spoken candidly about all her religious beliefs that formed the basis for her objection to the COVID vaccinations, but instead to have predicted that years later, a judge would decide most of those religious beliefs were invalid, and that she would need to parsimoniously articulate the remaining belief in isolation.

Stynchula's requests for exemption were well-articulated and coherent for a layperson, and she was not required to have predicted and satisfied such a tortured dissection of her sincerely-held religious beliefs. "Courts should not undertake to dissect religious beliefs because the . . . beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Thomas*, 450 U.S. at 715.

B. STYNCHULA'S RELIGIOUS BELIEFS WERE SINCERE.

Furthermore, the court wrongly found that, "[t]here can be no dispute that Stynchula's … fetal cell line opposition to the COVID vaccines is not sincerely

held." JA1384, 1389. To reach this conclusion, the district court had to ignore undisputed facts about intentional actions Stynchula took well before the COVID vaccines existed, and focus myopically on when, during the exemption application process, she first mentioned her fetal cell objection to the COVID vaccines. JA1389. Even though it was undisputed that, as a result of her strict adherence to her beliefs Stynchula "has not received *any* vaccines for 30 years," the district court faulted her because she had not "presented any evidence that she ever objected to other vaccines or medicines on abortion-related … grounds," and only "raised her fetal cell line objection [in] her final exemption appeal." *Id*. This reasoning only holds together if the other religious beliefs cited by Stynchula's application were secular and not religious.

When asked during her deposition whether she maintained an opposition to the use of fetal cells prior to her July 2022 exemption application, Stynchula explained that there had been no wavering in her belief; her references in earlier applications to her Catholic background implied a pro-life position, and she had not provided an exhaustive list of "every single aspect of [her] belief, but [she] believed that [her] entire life." JA1070-1071. She elaborated that even in her earlier applications, "that would have been one of the reasons that I would not get the vaccine." JA1072. Stynchula noted that she had not included "all the religious beliefs that precluded [her] from receiving the vaccine" in her earlier applications,

conceding that she is "not a theologian" and could articulate "more if [she] went and got a Ph.D. in theology, [and could then] explain [her] foundational beliefs better." JA1060; JA751. But it was not her legal burden to articulate "with the clarity and precision that a more sophisticated person might employ." *Thomas*, 450 U.S. at 715.

In her deposition, Stynchula recounted that, when she returned to bedside nursing, she first considered working in labor and delivery, but then "realized that sometimes people came in for voluntary terminations of pregnancy" and that led her to "decide[] not to work in labor and delivery," opting for post-partum care instead. JA1072. Even with this evidence of a longstanding opposition to abortion, one which influenced a major career decision in her life, the court ruled that there was no evidence that a jury could credit to conclude that Stynchula's stated religious beliefs were sincerely held. JA1386.

The last basis for denying the sincerity of Stynchula's beliefs in the district court's analysis was the nature of her "investigation of the Novavax vaccine," which became available contemporaneous with the final termination of her employment. JA1392. The court decided Stynchula's efforts of "reviewing the Novavax website, asking a pharmacist [about] the Novavax insert, and visiting one webpage from Inova was insufficient. JA1391. Stynchula "knew that Novavax had some fetal cell issues that [she] couldn't get clarification on" despite "digging all over trying to find clarification to see if [fetal cells] w[ere] involved in it," and that she "want[ed] to get

the answers directly from the researchers and not from a third party . . . [like] Inova." JA1065; JA1067.

As discussed in section IV-B, *supra*, the Novavax vaccine did not resolve Stynchula's many religious objections to the COVID vaccine and to vaccines more generally. It is only within the contrived confines of the earlier ruling of the district court that the myopic focus on Novavax could work to moot Stynchula's religious objections. The fact that she did not engage further or place trust in the statements of the employer that was in the process of terminating her employment does not render insincere her longstanding religious beliefs opposed to vaccination and the COVID vaccines in particular.

## VI. THE DISTRICT COURT ERRED IN EXCLUDING DR. SHERLEY'S EXPERT TESTIMONY.

The remaining error of the district court pertains to the treatment of the expert witness testimony proffered by Stynchula and Birke. To conclude that "there is no genuine dispute that [they] could have complied with both Inova's COVID vaccination policy and the religious beliefs they communicated once Novavax became available," the district court had to disregard entirely the expert testimony and other supporting evidence that contradicted that conclusion. JA1391. The district court concluded that there was "no admissible evidence" of a factual dispute on whether Novavax was tested on fetal cell lines. JA1391.

Stynchula and Birke had provided both peer-reviewed medical literature and an expert opinion as evidence, sufficient to establish a genuine issue of material fact. However, the court held that their expert's opinion was inadmissible, and that therefore, there was "no evidence [to support] the contention that Novavax was 'tested' on fetal cell lines." JA1398. A fatal flaw in that analysis, never addressed in the court's ruling, was that Inova's own expert acknowledged, from his review of the evidence in the case, that Novavax had been tested on fetal cells. JA1136 ("The article Dr. Sherley cites seems to indicate that the Novavax COVID-19 vaccine was tested in HEK293 cells"). Even if Stynchula and Birke were unable to proffer their expert at trial, this concession would have been sufficient for a jury to find in their favor.

Beyond Inova's expert witness testimony on the subject, the court's only factual basis for determining the Novavax vaccine did not use fetal cells were the wrongly admitted hearsay communications between Novavax and Inova, discussed above. JA1398-1399. The district court then simply excluded or ignored all contrary evidence, excluding as "irrelevant and unreliable and thus inadmissible" the expert testimony of Dr. James Sherley that Stynchula and Birke had proffered. JA1400. This was error. Dr. Sherley's report was relevant to this critical dispute in this case, and his opinion is reliable under the law. His testimony should have been admitted, as it illuminated a genuine issue of material fact that would have barred the entry of summary judgment.

Expert testimony must "rest[] on a reliable foundation and []be relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017). If the expert's opinion testimony meets that simple threshold, any criticisms of his testimony will apply to its probative weight as assessed by the fact-finder, but will not affect admissibility, and becomes an issue for the jury. *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195-96 (4th Cir. 2017).

A. DR. SHERLEY'S OPINION IS RELIABLE.

First, Dr. Sherley relied on a reliable source to develop his opinion, the article partially authored and funded by Novavax, entitled "Structural analysis of full-length SARS-CoV-2 spike protein from an advanced vaccine candidate" ("the Bangaru article"). JA1403 (citing Sandhya Bangaru, *et al.*, *Structural analysis of full length SARS-CoV-2 spike protein from an advanced vaccine candidate*, 370:6520 SCIENCE 1089-1094 (Oct. 20, 2020) ["Bangaru article"]; Sandhya Bangaru *et al.*, *Supplementary Materials for Structural analysis of full length SARS-CoV-2 spike protein from an advanced vaccine candidate*, SCIENCE (Oct. 20, 2020) ["Bangaru Supplement"]). That article, as explained by Dr. Sherley, was "conducted at the prerogative of Novavax to determine whether the Sf9 cell technology produced spike proteins that were comparable in structural elaboration to the spike proteins produced in the HEK293F cell formulations." JA910. He also explained the

supplement to that article, which described how, in addition, "the Novavax vaccine was [also] tested using a pseudovirus created through the use of HEK293F cells." JA910. Dr. Sherley also relied on funding disclosures, which indicated that Novavax Inc. funded this testing. JA910-911.

Based on these sufficient facts and data, Dr. Sherley used reliable principles to interpret that study for what it actually stated: the Novavax vaccine was tested on fetal cell lines. The evidence was so clear on this issue, that Inova's expert had to concede the point. JA1136. That undergirding evidence did not require him to extrapolate from data or test a theory, merely to explain what peer-reviewed medical literature, co-authored and co-funded by Novavax, had acknowledged.

Given the close adherence to reliable, supporting data, Dr. Sherley's opinion meets and surpasses the minimal threshold for reliability. Dr. Sherley's expert opinion is based on relevant literature in the scientific field, and not based on mere belief or speculation. *Nease*, 848 F.3d at 231. Furthermore, because Dr. Sherley can explain how he reached his conclusion, the sufficient basis that allowed him to reach that conclusion, and how that scientific conclusion relates to the issues at bar, he has satisfied the reliability requirement. *In re Under Armour Sec. Litig.*, Civil Action No. RDB-17-0388, 2024 U.S. Dist. LEXIS 68718, at *11 (D. Md. Apr. 16, 2024). This is far from an appeal to *ipse dixit* warned against by the Supreme Court. *GE v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997) (explaining that

"[t]rained experts commonly extrapolate from existing data," but a district court should not admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert").

Dr. Sherley's testimony was proffered to explain the statements of medical literature produced in part by Novavax itself, and such explanation did not require him to extrapolate from that information, merely to explain it. He did not state any opinion which would require the court merely to accept his word on the subject. There was no analytical gap between the data and the opinion proffered. Accordingly, Dr. Sherley's testimony should have been accepted as reliable.

The district court decided that the expert opinion was not "founded upon 'sufficient facts or data'" and did not "reflect[] a reliable application of [reliable] principles and methods to the facts of the case." JA1402. However, the district court acknowledged that "Dr. Sherley relied on an article from *Science* magazine and its supplement." JA1403. The district court also acknowledged that the Bangaru article and its supplement were reliable. JA1403. However, the district court decided that those materials lacked "sufficient information to allow Sherley to draw reliable conclusions." JA1404.

The court ruled the testimony was unreliable because Dr. Sherley based his opinion on his industry experience in biomedical research (including research with bioethical concerns), opining that the Novavax company's participation and funding

of the Bangaru research to test Novavax meant it was connected to that research. JA1404. Dr. Sherley had explained, based on his expertise and experience, that the research and testing that formed the basis of the Bangaru article would have been instrumental in bringing the vaccine to market, and that Novavax's direct funding of that research and testing demonstrated the company's investment in that endeavor. JA910-911. The district court, however, determined that Sherley did not explain enough about his experience to explain that Novavax funded the fetal cell testing, and that his explanation about the Bangaru article's role in bringing the vaccine to market could not be reliably applied. JA1404.

The court's analysis subtly reframed the issue of fact, from a question whether the Novavax vaccine had been tested on fetal cells, into a question of whether Novavax was directly responsible for the testing, an issue that was immaterial to the religious objections explained by Stynchula and Birke. JA1236; JA1240. The district court initially framed the central issue for which Dr. Sherley's opinion was offered as "whether Novavax was tested on fetal cell lines." JA1391. Later, the district court reframed the "pertinent issue" as "whether *Novavax used* fetal cell lines in the development or testing of its COVID-19 vaccine." JA1401 (emphasis added). This reframing is erroneous, as it mischaracterized the religious objections Stynchula and Birke raised against the use of fetal cell lines. Stynchula and Birke premised their objection on whether fetal cells were used in the development,

manufacture, or testing of the vaccine, irrespective of whether *the manufacturer performed the testing*. JA1236; JA1240. Their religious concerns were not tied to whether the vaccine's manufacturer had actually performed the testing, nor whether the manufacturer had paid directly for the testing. Absent the contrivance of the district court's reframing of the issue, Dr. Sherley's opinion is entirely reliable and directly on point.

B. Dr. Sherley's opinion is relevant.

As noted above, the district court itself initially framed as critically relevant the central issue for which Dr. Sherley's opinion was offered, "whether Novavax was tested on fetal cell lines" (JA1391), before later reframing the issue into "whether Novavax used fetal cell lines in the development or testing of its COVID-19 vaccine" (JA1401). The topic itself was relevant, and if the evidence provided addressed that topic, then that evidence was relevant. The district court's exclusion of Dr. Sherley's testimony rested upon a supposition that it was irrelevant because "he never answer[ed] the question." JA1401. This is simply incorrect.

For his part, Dr. Sherley summarized his opinion by stating that the Novavax vaccine "was tested in the post-production phase using abortion-derived fetal cell lines," and that the Novavax company "funded and relied on testing which utilized HEK293-produced protein, both for a comparison with the Sf9-produced protein and for production of pseudovirus for antibody neutralization studies." JA909-910. In

light of the available evidence, he concluded that "aborted fetal cells were substantially involved in the quality testing of Novavax vaccine, albeit not in its development or manufacturing processes." JA911.

Dr. Sherley's opinion was founded on published medical literature, the principal article of which having been co-authored by six Novavax employees. JA1164-1165. That article expressly stated that the Novavax vaccine "was tested in the post-production phase using abortion-derived fetal cell lines." JA909. The research for that article was "conducted at the prerogative of Novavax to determine whether the Sf9 cell technology produced spike proteins that were comparable in structural elaboration to the spike proteins produced in the HEK293F cell formulations." JA910. Sherley likewise explained the supplement to that article, which described how, in addition to the testing modality described in the main article, "the Novavax vaccine was tested using a pseudovirus created through the use of HEK293F cells." JA910. Dr. Sherley also relied on the article's funding disclosures, which indicated that Novavax Inc. funded this testing. JA910-911. In short, it cannot be disputed that Novavax contributed to the funding for the Bangaru study and the fetal cell testing for their product that was part of the study. JA1229-1231.

Moreover, Stynchula and Birke provided additional evidence of other published medical literature that report the same fact—that Novavax vaccine was

tested prior to approval and administration using fetal cell lines. JA1188 ("neutralization was assessed with spike-pseudotyped virus infection of HEK293T/ACE2 cells"); JA1216-1217 ("The NVX-CoV2373 'Novavax' vaccine ... utilized aborted fetal cell lines during testing").

Despite all of this, the court ruled that "the Bangaru article and its supplement simply do not provide sufficient information to allow Sherley to draw reliable conclusions." JA1404. The court stated that there was "[in]sufficient evidence regarding the funding and purpose of the Bangaru study [to opine] that 'aborted fetal cell lines were substantially involved' in Novavax's quality testing." JA1405. This reliable evidence was too limited to serve as a factual basis for the opinion offered. JA1405.

The district court's narrow focus on "the funding and purpose of the Bangaru study" ignores the critical fact that it contains, that the Novavax vaccine was tested on aborted fetal cells in two separate tests. It is only by distorting the issue presented that the district court could rule that Sherley's testimony was irrelevant, because his expert opinion directly addressed the relevant issue in dispute.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellants respectfully requests that this Court REVERSE the Orders granting dismissal, and REMAND these cases to the district Court for further proceedings as appropriate.

## REQUEST FOR ORAL ARGUMENT

Appellants believe oral argument would be helpful to further elucidate the issues raised by this appeal, and therefore request a hearing on this matter.

*/s/ Timothy P. Bosson*

Timothy P. Bosson (VSB: 72746)
Isaiah R. Kalinowski (VSB: 71125)
Robert G. Rose, Esq. (VSB: 81240)
Arie M. Jones, Esq. (VSB: 98248)
**Bosson Legal Group, PC**
8300 Arlington Blvd., Suite B2
Fairfax, VA 22031
tbosson@bossonlaw.com
ikalinowski@bossonlaw.com
Ph: (571) 775-2529
*Counsel for Appellant*

Filed: 10 February 2025

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    This document contains <u>12,955 </u>words.

2.     This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

<u>*/s/ Timothy P. Bosson*</u>
Timothy P. Bosson, Esq.